THE COURT.
 

 Plaintiff Hartman Ranch Company is the owner of land subject to an oil and gas'lease, which provides for a
 
 Ys
 
 royalty to the lessor on all oil and other substances produced. Said lease was executed on October 18, 1913, to Joseph B. Dabney as lessee. Lloyd, Miley and Buley thereafter became coowners of the lease with Dabney. Defendant Associated Oil Company is in possession of said land, either as an assignee or sublessee through the aforesaid parties, and is producing oil therefrom. Said defendant is a sub-lessee of the land adjoining the property of plaintiff on the south. The contention of plaintiff is that the defendant by active and intensive drilling operations on this southern tract, referred to as the Lloyd lease, is draining oil from the Hartman property. Plaintiff contends that the failure of the defendant to drill additional wells on the Hartman property constitutes a breach of an implied covenant in the Hartman lease to protect the lands from drainage. Plaintiff sued to recover lessor’s royalty lost through the alleged drainage. It also prayed for forfeiture of the lease for the alleged breach of said implied covenant.
 

 The jury returned a verdict for plaintiff in the sum of $593,700 damages for loss of royalty for the four-year period prior to March 7, 1933, when this action was filed. Upon the equitable issue of forfeiture the trial court made findings and entered a conditional decree for forfeiture, which will be described hereinafter.
 

 The main contentions of defendant upon this appeal are: (1) That the parent lease upon which this action is brought makes express provision for the number of wells to be drilled, with which provision defendant has fully complied, and this express provision negatives the existence of an implied covenant to drill additional wells to protect from drainage. (2) That defendant is a sublessee and as such is not subject
 
 *238
 
 to an action by the original lessor for breach of covenants of the parent lease. (3) .That the evidence is insufficient as a matter of law to establish cither the fact of drainage or the amount thereof.
 

 We shall consider first the contention that the provisions of the express covenant negative an implied covenant to protect against drainage. The Hartman lease was for a term of twenty years from October 18, 1913, and as much longer as the production of oil and other substances might be profitable. Within ninety days after completion of a well on the Lloyd property to the south, which well was required to be started by January 20, 1914, the lessee was required to start .drilling a well on the Hartman property, and to drill a well “each year thereafter until ten wells have been drilled in all”. On October 13, 1919, an instrument was executed which provided that the lessee should be permitted to drill each well to completion or abandonment before commencing work on a subsequent well, and within ninety days after either the completion or the abandonment of a well the lessee should commence work on the next well, ‘ ‘ and in this manner proceed to drill the ten (10) wells as in said lease required . . . provided that the lessees shall have the right to drill more than one well per year or more than ten wells in all if in the lessee’s judgment the drilling is justified by the production obtained and the area of land to be drilled”.
 

 In 1916 Dabney, the original lessee, and Lloyd, Miley and Buley, who had become coowners with Dabney of the Hartman lease, executed a sublease to the Shell Oil Company. In 1924 this company surrendered its sublease on the ground that the property could not be profitably drilled, but retained Hartman wells 1 and 2, drilled by it. These two wells were surrendered in October, 1925. On January 14, 1925, an agreement was executed by the lessor and Dabney, Lloyd, Miley and Buley, which gave said lessees until April 1, 1926, to commence drilling of the third well. The sum of $10,000 was paid to the lessor for this extension.
 

 On January 20, 1925, Dabney and his associates executed the instrument under which defendant Associated Oil Company is now in possession of the Hartman property. It drilled Hartman 3 to completion in June, 1926, and drilled a second well in 1926. It drilled three wells in 1927, one in 1928, four in 1929, one in 1931, and commenced a twelfth
 
 *239
 
 well just after the instant action was filed. The express covenant in the lease provided for only ten wells.
 

 The present action is upon the parent Hartman lease, in which, plaintiff contends, the law will imply a covenant to drill sufficient wells to protect from drainage notwithstanding the provision of the express covenant as to ten wells. In the absence of express provision it is well settled that covenants will be implied to use reasonable diligence in the exploration and discovery of oil, and thereafter in the development of the oil lease, and protection from drainage through wells on adjoining lands.
 
 (Brewster
 
 v.
 
 Lanyon Zinc Co.,
 
 140 Fed. 801;
 
 Jones
 
 v.
 
 Interstate Oil Corp.,
 
 115 Cal. App. 302 [1 Pac. (2d) 1051];
 
 Fallís
 
 v.
 
 Julian Petroleum Co.,
 
 108 Cal. App. 559, 565 [292 Pac. 168], and other cases cited
 
 infra;
 
 notes, 60 A. L. R. 950; 19 A. L. R. 437.) Where express covenants do not cover completely all phases of the lessee’s obligation in regard to exploration, development and protection, implied covenants may coexist with express covenants. Since the consideration for such leases is entirely or in large part the oil royalty payments to be made to the lessor, such covenants must be implied to protect the lessor and carry out the purpose of the lease. It is agreed, of course, that implied covenants will not be raised which are in conflict with express covenants. Respondent herein contends that the covenant as to ten wells relates to development in the absence of drainage, but does not define the lessee's obligation of protection in the event of drainage. That is, in the absence of drainage, the lessee was not required to drill more than ten successive wells, even though a large number, or the same number drilled in a shorter time, would secure a greater immediate output.
 

 In
 
 Texas Co.
 
 v.
 
 Ramsower,
 
 (Tex. Com. App.) 7 S. W. (2d) 872, an express covenant of the lease provided that the lessee should commence a well within a year or paj $200 annually to defer commencement. The court held that this stipulation did not relate to the covenant implied by way of addition to protect from drainage. Payment of the delay rental would not relieve from the obligation to protect against drainage. The two covenants, the one express, the other implied, related to different subjects. (See, also,
 
 Blair
 
 v.
 
 Clear Creek & Gas Co.,
 
 148 Ark. 301 [230 S. W. 286, 19
 
 *240
 
 A. L. R. 430]; Merrill, Covenants Implied in Oil and Gas Leases, p. 171, sec. 63, p. 180, sec. 71.)
 

 In
 
 Hughes
 
 v.
 
 Busseyville Oil & Gas Co.,
 
 180 Ky. 545 [203 S. W. 515], where the express covenant apparently required that a well be drilled within two years, the court held that after said period had elapsed and the well had been drilled there was no obligation to drill other wells in so far as development was concerned, but that said express covenant did not relate to drainage; that it would be a manifest injustice to the lessor if the lessees were permitted to stand upon the terms of the contract and at the same time destroy its substance by permanently taking through operations on adjoining land the income which the lessor had the right to enjoy.
 

 In
 
 J. M. Guffey Petroleum, Co.
 
 v.
 
 Jeff Chaison Townsite Co.,
 
 48 Tex. Civ. App. 555 [107 S. W. 609], where the lease contained no express covenants as to the number of wells, but after one large producing well was in operation the parties entered into an agreement by reason of marketing conditions limiting the output of the leased property to one-sixth of the capacity, of the well already drilled (20,000 barrels per month), it was held that “if it became necessary after the execution of this contract in order to protect the lease from drainage to take more than 20,000 barrels per month from this well, or to sink other wells, said contract did not relieve appellant of such duty”.
 

 In
 
 Jackson
 
 v.
 
 Texas Co.,
 
 75 Fed. (2d) 549, the covenant was contained in a deed whereby the grantor-covenantor reserved to itself all oil rights in land deeded to plaintiff. It provided that the grantor “should never be under any obligation to develop said land for minerals”, but if at any time it did produce minerals in paying quantities it should pay the grantee a royalty. The court held that a successor of the grantor-covenantor was under a duty to protect the land from drainage through wells on adjacent land operated by such successor. The express covenant as to no development and the implied covenant as to protection from drainage are not conflicting, but may exist together.
 

 The cases of
 
 Stanley
 
 v.
 
 United Fuel Co.,
 
 78 W. Va. 793 [90 S. E. 344], and
 
 Carper
 
 v.
 
 United Fuel Gas Co.,
 
 78 W. Va. 433 [89 S. E. 12, L. R. A. 1917A, 171], may also be noted. In said cases it was held that although the lease con
 
 *241
 
 tained a provision that the lessee might delay drilling a well upon payment of delay rental, there was an implied condition that if the lessor demanded the drilling of offset wells to protect from drainage the lessee should drill such wells.
 

 The above cases all apply the principle for which' plaintiff contends herein—that in the absence of a clear expression of intent, express covenants as to
 
 development
 
 do not relieve the lessee from an implied covenant to drill additional wells to protect from drainage. Not many cases on the subject of implied covenants in oil leases are to be found in this state. In
 
 Acme Oil & Min. Co.
 
 v.
 
 Williams,
 
 140 Cal. 681 [74 Pac. 296], and
 
 Jones
 
 v.
 
 Interstate Oil Corp.,
 
 115 Cal. App. 302 [1 Pae. (2d) 1051], the general doctrine of implied covenants was given recognition. In
 
 Becker
 
 v.
 
 Submarine Oil Co.,
 
 55 Cal. App. 698 [204 Pac. 245], the lease contained a provision that the lessee should complete three wells within ninety days, and ten wells within one year. The lessee completed ten wells, and thereafter for ten years did not drill any additional wells. The court held that there was no implied covenant to drill additional wells. But there is no intimation in the opinion that drainage was alleged, and the court did not consider whether the express covenant would be the sole measure of the obligation of the parties had drainage existed. Furthermore, as an alternative ground of decision, the court held that assuming the existence of an implied covenant to drill such additional wells as reasonable diligence required, the evidence did not indicate that in the exercise of reasonable diligence further wells should have been drilled, and hence would not justify a finding of breach of any implied covenant.
 

 In the instant case the drainage of the Hartman property in possession of defendant Associated Oil Company is alleged to arise from the operations of said defendant on the adjoining Lloyd property to the south. We need not decide herein whether the express covenant requiring ten wells would exclude an implied covenant generally to drill further wells to protect from drainage due to drilling by other operators than defendant. It certainly should not be held to have been within the contemplation of the parties that one who is in possession of the Hartman leasehold, and who, as we have hereinafter discuss, has assumed the obligations of the Hartman lease, should by its own affirmative operations on adjoining land drain oil from beneath the Hartman property. The ex
 
 *242
 
 press covenant cannot be construed as an authorization for so doing. (In the following cases the lessee was also the lessee of adjoining land:
 
 Blair
 
 v.
 
 Clear Creek Oil & Gas Co., supra; Jackson
 
 v.
 
 Texas Co., supra; Culbertson
 
 v.
 
 Iola Portland Cement Co.,
 
 87 Kan. 529 [125 Pac. 81, Ann. Cas. 1914A, 610];
 
 Kleppner
 
 v.
 
 Lemon,
 
 176 Pa. 502 [35 Atl. 109].)
 

 We conclude on this branch of the case that in the circumstances shown there was an implied covenant in the Hartman lease requiring protection from drainage through operations on adjoining land by the party in possession of the. Hartman leasehold.
 

 This brings us to consideration of the question whether defendant Associated Oil Company is liable in damages for breach of said covenant. Defendant contends that as a sublessee it is not liable to the original lessor in damages for breach of covenants in the parent lease. This doctrine as to sublessees generally is well settled. (1 Tiffany, Landlord and Tenant, pp. 1000, 1133; Taylor, Landlord and Tenant, 9th ed., sec. 16, sec. 426; 15 Cal. Jur. 766;
 
 McNamer Realty Co.
 
 v.
 
 Sunburst Oil & Gas Go.,
 
 76 Mont. 332 [247 Pac. 166, 171].) It is an application of the rule, embodied in section 1465, Civil Code, that covenants running with the land bind only those who acquire the whole estate of the covenantor in some part of the property. (See, also, sec. 822, Civ.. Code.) A sublessee is liable only to his own lessor, that is, the sub-lessor, since he does not acquire the whole estate, but only a portion of the unexpired term.
 

 Respondent disputes appellant’s contention that the instrument under which it holds is a sublease, rather than an assignment. Respondent further contends that if said instrument is a sublease, appellant is liable to it by virtue of appellant’s express promise in the sublease assuming the parent lease.
 

 The generally stated distinction between an assignment and a sublease is that an assignment transfers the entire unexpired term. In the instant ease the original lease was for a term of twenty years from October 18, 1913, and as much longer as the production of oil and other hydrocarbon substances should be profitable. The term of the instrument under which the defendant holds is similarly described. However, the instrument under which defendant is in possession provided for a one-fifth royalty, while the original lease provided for a one-eighth royalty. The one-fifth royalty was to
 
 *243
 
 be paid by defendant to Dabney (original lessee) and his associates, and the one-eighth was to be deducted therefrom by them and turned over to the parent lessor. The instrument under which defendant is in possession also gave Dabney and his associates a right of reentry for breach of any stipulation therein.
 

 By virtue of our decision in
 
 Barkhaus
 
 v.
 
 Producers Fruit Co.,
 
 192 Cal. 200 [219 Pac. 435], followed in
 
 Kendis
 
 v.
 
 Cohn,
 
 90 Cal. App. 41, 48 [265 Pac. 844],
 
 Backus
 
 v.
 
 Duffy,
 
 103 Cal. App. 755 [284 Pac. 954], and
 
 Webb
 
 v.
 
 Jones,
 
 88 Cal. App. 20, 27 [263 Pac. 538], we are committed to the so-called Massachusetts rule that where the transferor reserves the right of reentry for breach of conditions he has a “contingent reversionary interest” which prevents his transfer from operating as an assignment of the whole of the unexpired term. Instead, a sublease arises.
 
 (Dunlap
 
 v.
 
 Bullard,
 
 131 Mass. 161, 162;
 
 Davis
 
 v.
 
 Vidal,
 
 105 Tex. 444 [151 S. W. 290, 42 L. R. A. (N. S.) 1084];
 
 Roberson
 
 v.
 
 Pioneer Gas Co.,
 
 173 La. 313, 314 [137 So. 46, 82 A. L. R. 1264, p. 1268];
 
 Smith
 
 v.
 
 Sun Oil Co.,
 
 165 La. 907 [116 So. 379];
 
 Johnson
 
 v.
 
 Moody,
 
 168 La. 799 [123 So. 330];
 
 Saling
 
 v.
 
 Flesch,
 
 85 Mont. 106 [277 Pac. 612]. The last four citations involved oil leases.)
 

 But in the instant case the sublease to defendant contained an express promise whereby defendant assumed the parent Hartman lease. The promise of assumption is broad and unequivocal. It provides: “Said lessee [Associated Oil Company] hereby expressly assumes and agrees to perform all the obligations and covenants provided for in said parent lease and said modification thereof to be performed by the lessee in said parent lease or said modifications, provided further that nothing herein shall deprive the lessee of the right to surrender this lease and relieve itself of its obligations hereunder.” Defendant contends that under certain decisions in this state the parent lessor may sue the sublessee on a contract of assumption only when the parent lessor is a party to it. In the case herein the above promise of assumption was contained in the sublease, to which the plaintiff Hartman Ranch Company, as parent lessor, was not a party.
 

 Most of the cases considering the effect of express contracts of assumption involve assignments, rather than subleases. An assignee in possession is liable to the parent lessor by virtue of privity of estate (covenants running with the land),
 
 *244
 
 and it is not ordinarily necessary to consider whether by virtue of an agreement of assumption there is also privity of contract between them. But where the assignee is no longer in possession, the privity of estate is terminated
 
 (Treff
 
 v.
 
 Gulko,
 
 214 Cal. 591 [7 Pac. (2d) 697]), and if he is liable to the lessor it is by virtue of his contract of assumption. Since as to both sublessee in possession, and the assignee who has terminated his possession there is no privity of estate with the lessor, cases involving an assignee who has assumed the parent lease, but is no longer in possession, will indicate the rule applicable also to sublessees who assume the parent lease.
 

 Respondent contends that the original lessor is a creditor beneficiary of a promise made by the sublessee with his sub-lessor to assume the covenants of the parent lease. Respondent also urges that an action by the lessor should lie on a covenant of assumption contained in a sublease in like manner as a grantee of a mortgagor, where such grantee assumes the mortgage, is subject to action by the mortgagee.
 

 Section 1559, Civil Code, provides: “A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it. ” Creditor beneficiaries have been recognized as coming within section 1559,
 
 supra,
 
 the effect of which is to exclude those who are only “incidentally benefited”.
 
 (Calhoun
 
 v.
 
 Downs,
 
 211 Cal. 766 [297 Pac. 548];
 
 Washer
 
 v.
 
 Independent M. & D. Co.,
 
 142 Cal. 702 [76 Pac. 654];
 
 Montgomery
 
 v.
 
 Dorn,
 
 25 Cal. App. 666 [145 Pac. 148];
 
 Malone
 
 v.
 
 Crescent City M. & T. Co.,
 
 77 Cal. 38 [18 Pac. 858];
 
 Whitney
 
 v.
 
 American Ins. Co.,
 
 127 Cal. 464 [59 Pac. 897];
 
 Flint
 
 v.
 
 Cadenasso,
 
 64 Cal. 83 [28 Pac. 62];
 
 Northrup
 
 v.
 
 Altadena etc. Syndicate,
 
 6 Cal. App. 101 [91 Pac. 422];
 
 Sierra Paper Co.
 
 v.
 
 Mesmer,
 
 45 Cal. App. 667 [188 Pac. 605];
 
 Sherwood
 
 v.
 
 Gill & Lutz,
 
 36 Cal. App. 707 [173 Pac., 171].) “A person is a creditor beneficiary if no intention to make a gift appears from the terms of the promise, and performance of the promise will satisfy a duty of the promisee to the beneficiary.” (2 Williston on Contracts, rev. ed., p. 1042; see, also, Restatement of Contracts, see. 133 [1] [b].) The obligation of the promisee, which the promisor agrees to perform, need not be for the payment of a money debt only.
 
 (D. Ghirardelli
 
 v.
 
 Hunsicker,
 
 164 Cal. 355 [128 Pac. 1041].)
 

 The promise of an assignee of a lease or of a sublease, agreeing with the original lessee to assume the parent lease, is
 
 *245
 
 plainly of this type. The lessee is under a duty to his lessor
 
 :
 
 to perform the covenants of the lease, express and implied. By assuming the lease the assignee or sublessee binds himself to perform these covenants. The original lessor, although not a party to the contract of assumption, is in the position of a creditor beneficiary in relation thereto, and as such has a direct right of action against the party assuming.
 

 It is recognized that in contracts of the creditor beneficiary type the main purpose of the promisee is not to confer a benefit on the third party beneficiary, but to secure the discharge of his debt or performance of his duty to the third party. (2 Williston on Contracts, rev. ed., pp. 1046, 1056, 1103;
 
 Calhoun
 
 v.
 
 Downs,
 
 211 Cal. 766 [297 Pac. 548].)
 

 Several decisions in this state contain statements that whether or not the parent lessor is a party to a contract of assumption he is nevertheless entitled to maintain an action thereon against the assignee (or sublessee) as on a contract of the third party beneficiary type.
 
 (Chase
 
 v.
 
 Oehlke,
 
 43 Cal. App. 435, 438 [185 Pac. 425];
 
 Lopizich
 
 v.
 
 Salter,
 
 45 Cal. App. 446, 449 [187 Pac. 1075];
 
 Bank of America Nat. Trust & Sav. Assn.
 
 v.
 
 Moore,
 
 18 Cal. App. (2d) 522 [64 Pac. (2d) 460];
 
 Realty & Rebuilding Co.
 
 v.
 
 Rea,
 
 184 Cal. 565, 569 [194 Pac. 1024].) It has also been declared that an assignee of a vendee in a contract of sale who assumes the contract may be held liable at the suit of the vendor.
 
 (Barberich
 
 v.
 
 Pooshichian,
 
 59 Cal. App. 507 [211 Pac. 236].) The cases which allow the mortgagee to sue the grantee of a mortgagor assuming the mortgage debt are generally decided with reference to an equitable subrogation theory, rather than with use of third party beneficiary terminology.
 
 (Hopkins
 
 v.
 
 Warner,
 
 109 Cal. 133 [41 Pac. 868];
 
 Williams
 
 v.
 
 Naftzger,
 
 103 Cal. 438 [37 Pac. 411].) But that the two doctrines have been more or less assimilated to each other is indicated in certain decisions.
 
 (Case
 
 v.
 
 Egan,
 
 57 Cal. App. 453, 455 [207 Pac. 388], the implication being in this ease that if the grantor had been personally liable, the mortgagee would have been a creditor beneficiary;
 
 Mottashed
 
 v.
 
 Central & Pacific Imp. Corp.,
 
 8 Cal. App. (2d) 256, 261, 264 [47 Pac. (2d) 525].)
 

 Appellant contends that the statements referred to above, to the effect that the lessor has a right of action on a contract of assumption, although not a party thereto, were
 
 dicta,
 
 since in those eases the lessor was in fact a party to the promise
 
 *246
 
 of assumption. The statements on which appellant relies as establishing a contrary rule were also unnecessary to the decisions. These statements have their origin in the early ease of
 
 Bonetti
 
 v.
 
 Treat,
 
 91 Cal. 223, 229 [27 Pac. 612, 14 L. R. A. 151], quoted in
 
 Baker
 
 v. J.
 
 Maier & Zobelein Brewery,
 
 140 Cal. 530, 534 [74 Pac. 22], In neither case was the declaration as to the effect of a promise of assumption necessary to the decision, since in both the assignee was in possession, and hence liable to the original lessor by virtue of privity of estate in the absence of any promise to assume the parent lease. The same comment may be made as to the case of
 
 Treff
 
 v.
 
 Gulko,
 
 214 Cal. 591, 600 [7 Pac. (2d) 697], where the statement as to the effect of a contract of assumption was
 
 dicta
 
 for the reason that the assignee had not assumed the parent lease. Probably this was also the situation in
 
 Bush
 
 v.
 
 Bastían,
 
 112 Cal. App. 644, 646 [297 Pac. 976], r We find no binding precedents in our decisions, and in this situation we are of the view that the better rule is that it is not necessary that the lessor be a party to the contract assumption in order to sue the assignee or sublessee thereon.
 

 In the instant ease the original lessee was Joseph B. Dabney. By instruments described in defendant’s answer as deeds, Dabney transferred an undivided cotenancy interest in the lease to Ralph B. Lloyd, and Dabney and Lloyd thereafter transferred cotenancy interests to E. J. Miley and A. M. Buley. These four men as colessees executed the sublease to defendant Associated Oil Company. There is no suggestion that these transfers of interests in the lease to Lloyd, Miley and Buley were not for the full unexpired term of the lease. In so far as duration of estate is concerned, Lloyd, Miley and Buley acquired an interest in the “whole estate” of the lessee, Dabney, and this characterizes them as assignees, rather than sublessees. Said four colessees, in possession through defendant as sublessee, are liable to plaintiff lessor upon the covenants of the Hartman lease by virtue of the privity of estate existing between them and the lessor. By virtue of the express agreement made with said four co-lessees assuming the covenants of the parent lease, defendant • as sublessee is liable directly to plaintiff. It may be that defendant would be liable to plaintiff lessor on the contract of assumption made with Dabney, Lloyd, Miley and Buley even though only Dabney were liable to plaintiff on the lease.
 
 *247
 

 (Washer
 
 v.
 
 Independent M. & D. Co.,
 
 142 Cal. 702, 707 [76 Pac. 654].)
 

 In the instant case Dabney and his associates by reason of the reservation of a one-fifth royalty (the royalty under the original lease being one-eighth) have an interest in the continuance of the parent lease and the performance of its covenants beyond the mere discharge of their obligation to the parent lessor. Under the sublease the one-fifth royalty was to be paid to the sublessors, who were to pay the one-eighth to the parent lessor. But it is not necessary that a contract be exclusively for the benefit of a third party to give him a right thereon.
 
 (Stanton
 
 v.
 
 Santa Ana Sugar Co.,
 
 84 Cal. App. 206, 209 [257 Pac. 907];
 
 Miles
 
 v.
 
 Miles,
 
 77 Cal. App. 219, 228 [246 Pac. 143];
 
 Le Ballister
 
 v.
 
 Redwood Theatres, Inc.,
 
 1 Cal. App. (2d) 447 [36 Pac. (2d) 827];
 
 Montgomery
 
 v.
 
 Born,
 
 25 Cal. App. 666 [145 Pac. 148].)
 

 Appellant suggests that if it is liable in an action by the lessor it may be held twice for the same obligation, since it is also liable to its promisees with whom the contract of assumption was made. This danger is not real. The rules pertaining to third party beneficiary contracts avoid such a result and will protect appellant. (2 Williston on Contracts, rev. ed., sec. 392, p. 1131; see. 394, p. 1136; see, also, sec. 141 [1] Restatement of Contracts.) The recovery of damages by plaintiff herein in the amount of one-eighth royalty on the oil and gas lost through drainage and depletion will bar an action for said one-eighth by the sublessors, Dabney and his three associates.
 

 Although our decision herein rests on the express'promise of assumption by the sublessee, we are not to be understood as laying down a rule that in the absence of such a promise the lessor may not recover from a sublessee in possession the lessor’s royalty percentage on oil produced from the leased premises, or on oil drained from the leased premises through operations of said sublessee on adjoining land. Under an ordinary lease the lessor cannot sue a sublessee for' money rental.
 
 (City Investment Co.
 
 v.
 
 Pringle,
 
 73 Cal. App. 782, 788 [239 Pac. 302].) But where rent or royalty under an oil lease is a percentage of the oil produced, or the proceeds therefrom, it would seem, in line with certain decisions involving other royalty problems, that the lessor has a definite property right in specific property, in the royalty percentage
 
 *248
 
 of oil produced from the leased property or the proceeds therefrom, and that the lessee by executing a sublease rather than an assignment cannot defeat the lessor’s direct right against the party by whom the oil has been produced from the leased premises. (See
 
 Schiffman
 
 v.
 
 Richfield Oil Co.,
 
 8 Cal. (2d) 211 [64 Pac. (2d) 1081].) It would be but a step to hold that the lessor, upon breach of a covenant to protect against drainage, may sue the sublessee to recover his lessor’s percentage upon oil not removed through wells on the leased premises, but drained from said premises by the sublessee' through his wells on adjoining land.
 

 Defendant makes the further point that plaintiff cannot recover on defendant’s express promise of assumption for the reason that plaintiff did not plead it, nor allege that it was made for its benefit.
 
 (Ericksen
 
 v.
 
 Rhee,
 
 181 Cal. 562, 565 [185 Pac. 847].) The complaint stated a cause of action based on the theory that defendant was an assignee of the lease. It alleged that defendant was “the owner and holder of said Hartman lease’’. Exhibit B of the complaint, which was a copy of the brief recorded memorandum of the instrument under which defendant entered, did not reveal the provisions of the full instrument which marked it as a sublease. The defendant annexed the full agreement to its answer and cross-complaint. Plaintiff then learned its contents, but it did not amend its complaint. The case was tried on the theory that a sublessee would be liable for breaches of the parent lease committed during his exclusive possession. Certain instructions submitted by the defendant itself and given by the court clearly assumed this liability, among them the following:
 

 “In considering the respective rights and obligations of the parties to this suit, you are to bear in mind, as I stated, that they are governed by the provisions of the written instruments, namely the lease from Katherine Hartman to Joseph B. Dabney, the sublease from Joseph B. Dabney and his associates to Associated Oil Company, and such other written agreements between Associated Oil Company and the plaintiff as have been introduced in evidence at this trial. ... In order that the plaintiff may recover in this case, it is essential that it first prove some breach on the part of the defendant, Associated Oil Company, of its obligations toward the plaintiff under these agreements. I mention these
 
 *249
 
 two leases because,
 
 having taken a sublease of the entire property from the original lessees of Katherine Hartman, Associated Oil Company has assumed the obligation of fulfilling toward plaintiff all of the duties which devolved upon Katherine Hartman’s original lessee. . . . ”
 
 (Italics ours.)
 

 Neither the answer nor demurrer set up in the defense that as a sublessee the defendant could not be sued by the original lessor. Paragraphs II and X (c) of the demurrer do not make this point. Under the law we now hold that plaintiff was entitled to judgment by reason of the express promise of assumption made by defendant. While plaintiff did not amend its complaint to allege said promise, defendant incorporated in its answer and cross-complaint a copy of the full agreement of subleasing, containing the promise of assumption. Defendant alleged that a controversy existed as to the respective rights and duties- of plaintiff and defendant thereunder, and prayed that the court declare and determine such rights and duties. In this situation the judgment will not be reversed because plaintiff did not amend its complaint to set up the promise of assumption.
 

 As a special ground of defense appellant averred in its answer that respondent’s action for damages was barred by the statute of limitations. Plaintiff sought recovery of damages for oil and gas drainage and depletion occurring within four years next preceding the filing of the complaint. The theory of plaintiff was that as the action was brought for breach of an implied covenant in the written lease, the four year period for actions on written instruments applied. (Sec. 337, subd. 1, Code Civ. Proc.) Defendant contends that since under the testimony of plaintiff’s witnesses additional wells should have been drilled as early as 1926 or 1927, the four year period commenced to run at that time, and action brought in March, 1933, was too late. We need not- decide the problems inherent in this contention, for defendant must be deemed to have consented in so far as the statute of limitations is concerned to the plaintiff’s recovery of the loss due to drainage and depletion during the four year period preceding action filed. Defendant requested and the court gave the following instruction :
 

 “This action was commenced on the 7th day of March, 1933. It purports to be an action for breach of the alleged implied covenant to protect plaintiff’s lands against alleged drainage. As this implied covenant arises, if at all, by terms
 
 *250
 
 of a written instrument, I instruct you that the plaintiff is precluded by the statute of limitations from claiming any damages for alleged breaches occurring prior to four years before the commencement of the action—that is to say, four years prior to March 7, 1933. In computing the amount of damages, if you find any were suffered by plaintiff, you will therefore ignore all claims for damages alleged to have been suffered
 
 prior
 
 to March 7,1929.”
 

 Said instruction constitutes a clear recognition that damages suffered
 
 after
 
 March 7,- 1929, were not barred by the statute of limitations. The defendant requested no other instructions bearing on the statute. A party may not complain of instructions given at his request.
 
 (Yolo Water & Power Co.
 
 v.
 
 Hudson,
 
 182 Cal. 48 [186 Pac. 772];
 
 Gray
 
 v.
 
 Ellis,
 
 164 Cal. 481 [129 Pac. 791];
 
 Hughes
 
 v.
 
 Pacific Elec. Ry. Co.,
 
 58 Cal. App. 375 [208 Pae. 335];
 
 Bloomberg
 
 v.
 
 Laventhal,
 
 179 Cal. 616 [178 Pac. 496]; 24 Cal. Jur. 870; 2 Cal. Jur. 848; 2 New. Cal. Dig. 623.)
 

 Defendant made both a motion for a directed verdict and for judgment notwithstanding the verdict. In neither did it urge the statute of limitations. Having waived the defense in the trial court, defendant cannot renew it on appeal. It is suggested in one of the briefs that defendant urged the defense on its motion for new trial. The record on appeal herein, which contains the notice of motion for a new trial, and the order of denial, does not show any reference to the statute of limitations. If the statute was in fact urged in the argument on the motion, defendant could not thereby nullify its prior conduct constituting a waiver. Whatever may be the rule where the plea of the statute is raised by the answer, but no instruction is requested or given on said plea
 
 (Jones
 
 v.
 
 Goldtree Bros. Co.,
 
 142 Cal. 383, 387 [77 Pac. 939];
 
 Castagnino
 
 v.
 
 Balletta,
 
 82 Cal. 250 [23 Pac. 127]), where the only instruction requested by the defendant on the subject constitutes a waiver of the plea, and said instruction is given, the defense cannot be reinstated thereafter on motion for new trial.
 

 This brings us to the third of the appellant’s three main contentions—that the evidence is insufficient as a matter of law to establish either the fact of drainage or the amount thereof.
 

 The Hartman lease is located in the Ventura Avenue oil field, near the city of Ventura, Ventura County. The forma
 
 *251
 
 tion from which oil is produced in this field is anticlinal in nature. That is, the structure has two sloping flanks which meet at a crest. The top line or ridge of the structure is known as the axis of the anticline. Wells are drilled on each flank of the structure. Beneath the surface there is a well-defined body of shale known as the Gosnell shale, which extends throughout the field, and is referred to as a marker. The ridge or axis of the base of this shale marker, as located through drilling records of wells in the field, is approximately 3,000 feet below sea level in the vicinity of the Hartman and Lloyd leases. The north and south slopes of the shale body, with the ridge or crest running east and west, descend from said ridge to increasing depths below sea level. Hereinafter when the stratigraphic penetration of a well is referred to, depth below the base of the Gosnell shale is meant. A reference to depth is to total depth.
 

 The property embraced in the Hartman lease, consisting of 147.58 acres, is located on the north flank, the southern boundary being some distance north of the subsurface axis at the base of Gosnell shale. The Lloyd lease, which adjoins the south boundary of the Hartman lease, commences on its northerly boundary north of the subsurface axis, and extends over the crest or ridge and down the south flank. It contains 1425 acres, a portion of which lies beyond the productive limits of the oil field. The productive portion of the lease contains about 430 acres. Said Lloyd lease extends farther in an easterly direction than the Hartman lease, and hence lies south of the north flank McGonigle lease, as well as south of the Hartman lease. Defendant Associated Oil Company also holds the McGonigle lease, and a lease upon land to the east of its own Lloyd lease, which easterly lease is referred to as the Ventura Land and Water Company lease. Thus the defendant is the lessee of approximately the eastern half of the Ventura Avenue field, upon both its north and south flanks.
 

 The defendant first acquired its sublease on the Hartman property on January 20, 1925. In October, 1925, Hartman wells 1 and 2, drilled by the Shell Oil Company, were surrendered to the sublessors, and this area added to defendant’s sublease. Under the parent lease as extended, and under its sublease, defendant was not required to commence drilling a well until April 1, 1926. It started before that date and on June 18, 1926, completed Hartman 3. Thereafter it completed ten other wells, as follows: 1926, 1 well in addition
 
 *252
 
 to Hartman 3; 1927, 3 wells; 1928, 1 well; 1929, 4 wells; 1930, no wells; 1931, 1 well. After commencement of the instant action it started another well, Hartman 14, for which the work order had been given in November, 1932.
 

 All wells except Hartman 11 are located in a line along the south side of the Hartman property at a distance of about 200 feet north of south boundary and are described as first line wells. Hartman 11, farther north, is a second line well. Hartman 20 and 19, also located upon the second line, were abandoned before completion after drilling to the respective depths of 1500 and 100 feet. A derrick was placed upon a second line location for Hartman 27, but no drilling done. According to defendant’s witness Jenkins, chief of the production division of the Associated Oil Company, these wells were not completed because the defendant company did not believe they would pay out.
 

 The defendant company became sublessee of the Lloyd lease on February 24, 1920. By January, 1925, when it acquired the Hartman lease, it had already completed eight wells on the Lloyd lease and produced therefrom 6,200,000 barrels of oil. Most of this production was from, above 5,000 feet in depth. These wells were small producers compared with the later deeper Lloyd wells made possible through great improvements in drilling equipment. Lloyd wells 9A, 16 and 15,- completed in 1925 below 5,000 feet in depth, were the deeper Lloyd wells which were regarded as revealing the immense potentialities of the Ventura Avenue field. Between January, 1925, and March, 1933, defendant company completed seventy wells on the Lloyd lease, as compared with eleven for the Hartman lease.
 

 The Lloyd lease, however, covers a much greater area. For this reason the plaintiff’s expert witnesses selected for comparison with the Hartman lease an area on the Lloyd lease of comparable size and location on the south flank, at approximately the same distance from the axis or crest as the Hartman lease on the north flank is distant from said crest. On this comparable area on the Lloyd lease 23 wells were completéd as compared with 11 on the Hartman lease. The location of all wells in the field is indicated on plaintiff’s Exhibit 215.
 

 It was the opinion of plaintiff’s expert witnesses that the unequal drilling program on the Hartman lease must inevitably have resulted in drainage from the Hartman prop
 
 *253
 
 erty to the Lloyd lease. From the date of the first production on the Hartman lease in June, 1926, to January 1, 1933, the Hartman lease produced 3,727,537 barrels of oil. The entire Lloyd lease produced 41,721,567 barrels up to January 1, 1933. During the four year period between March 1, 1929, and March 1, 1933, the production figures were: Hartman lease, 2,269,087 barrels of oil; Lloyd area of 23 wells, 9,036,493 barrels; entire Lloyd lease, approximately 20,000,000 barrels.
 

 No claim is made that the productive period of the field is approaching an end. According to defendant’s witness Hertel, his estimate was that the entire Ventura Avenue field would produce more than twice as much as it had produced from the inception of production up to January 1, 1933.
 

 The defendant company since it became sublessee of the Hartman property in 1925 has paid royalty on oil produced from the Hartman property on the one-fifth basis provided in its sublease in the amount of $1,154,261.60. Of this sum plaintiff and its predecessor, Katherine Hartman, had received almost $800,000 and the sublessors more than $300,000. Of the eleven Hartman wells drilled to completion, Hartman 3, 15 and 16, drilled in 1926, 1931 and 1929, respectively, had not paid out at the time of trial in November, 1933.
 

 Since the lessor receives its royalty percentage on the gross oil produced (excepting only oil, gas and water used on the property), without deduction for operating expenses, a conflict of interest may arise between lessor and lessee as to whether additional wells should be drilled. The court herein protected the defendant lessee in this matter by its instructions to the jury that said defendant Associated Oil Company was only required to drill additional wells to protect from drainage if said wells would be paying wells which could be operated at a reasonable profit to defendant.
 

 Plaintiff contends that defendant’s heavy drilling program on the Lloyd lease to the south was induced in part by the provisions of the sublease under which it held said property. The term was to end on October 31, 1933. Thereafter the lessee could continue to operate wells already drilled, but could drill no new wells. The Hartman lease was for twenty years and as much longer as production should be profitable, and contained no limitation as to drilling new wells. Paragraph 14 of the Lloyd sublease required the sublessee to operate “so as to secure a maximum production”. However,
 
 *254
 
 paragraph 13 fixed the number of wells which the sublessee should drill each year at two.
 

 Defendant’s witnesses testified that the company did not undertake a more extensive drilling program on the Hartman lease due to the belief of its officers, induced by the relatively poor showing of the Hartman first line wells, that at no time would a second or third line of wells back of the first line have paid out. Defendant’s witness Folsom testified that in his opinion the line of Hartman wells marked the limits of production on the north flank. Nevertheless defendant was unwilling at the time of trial to relinquish the northern part of the Hartman lease, retaining the wells already drilled by it. It desired to retain this undrilled area on the chance that deep well tests might establish a productive zone at greater depths, and also as a protection against possible “whip-stocking”, or slant drilling, by another operator into the drilled portion of the Hartman lease.
 

 Plaintiff’s witnesses Gill an, Soper and Herold, who estimated the amount of drainage and loss during the four year period, were of the view that if the two leases had been equally and simultaneously drilled the Hartman lease and the 23-well area of the Lloyd lease would have produced equally. This conclusion is necessarily based on the premise of equal impregnation of oil and equality of other conditions affecting production. The assumption of equality of conditions made by plaintiff’s expert witnesses was, in turn, based on their opinion that the anticline was structurally symmetrical, that is, the north and south flanks had the same angle of slope. An anticline on which one flank descends from the crest line at a steep angle, and the other flank has a gentler slope is asymmetrical.
 

 It may well be said at this point that an exact knowledge of subsurface conditions or an exact estimate of drainage is in the nature of things impossible, and that if there has been a breach of an express or implied covenant to protect from drainage the lessee or sublessee cannot escape liability for his wrongful act by reason of the difficulty of exact measurement of damages.
 
 (McConnell
 
 v.
 
 Corona City Water Co.,
 
 149 Cal. 64, 67 [85 Pac. 929,
 
 8
 
 L. R. A. (N. S.) 1171];
 
 Northern Light Min. Co.
 
 v.
 
 Blue Goose Min. Co.,
 
 25 Cal. App. 282, 294 [143 Pac. 540];
 
 Blair
 
 v.
 
 Clear Creek Oil & Gas Co.,
 
 148 Ark. 301 [230 S. W. 286, 19 A. L. R. 430];
 
 *255
 

 Daughetee
 
 v.
 
 Ohio Oil Co.,
 
 263 Ill. 518 [105 N. E. 308];
 
 Meyers
 
 v.
 
 Texas Co.,
 
 6 Cal. (2d) 610, 616 [59 Pac. (2d) 132]; 17 Cor. Jur. 756, 757.)
 

 Defendant emphasizes its awareness of the rule that in eases of conflicting evidence, or conflicting inferences to be drawn from testimony, the decision of the jury and trial court is binding on this court as an appellate tribunal. But defendant contends that whereas plaintiff’s witnesses have merely assumed symmetry of the anticline and from that assumption inferred equal impregnation of the two flanks as the foundation for their subsequent conclusions, the defendant’s evidence demonstrates as a matter of law that there is inequality of impregnation as between the two flanks, the south flank being much more productive. Defendant suggests that if the two flanks were originally unequally impregnated with oil, then inequality of
 
 production
 
 is no indication either of the fact of drainage or of the amount thereof, and plaintiff has failed to prove these two essentials of its case. Respondent’s witnesses, however, emphasized not only the inequality in the amount of oil produced, but the inequality of drilling operations. As to the fact of drainage, as distinguished from the amount thereof, it is entirely consistent with the testimony of plaintiff’s expert witnesses that great inequality of drilling operations would cause drainage from a less heavily saturated area to a more productive area.
 

 Appellant also contends that a consideration of the pressures registered on the Hartman and Lloyd leases indicated that pressures on the Hartman lease are lower than on the Lloyd lease, and this demonstrates as a matter of law that there could not be drainage from the Hartman to the Lloyd area. The drilling of a well creates an area of low pressure, causes gas to be released from solution in the oil and to move toward the well from all directions, bringing oil with it. It is the differential in pressure between the bottom of the well and points back of it which causes the gas and oil to move. Both parties are agreed that it is reservoir or bottom of the hole pressures which should be compared. However, such pressures were not registered by defendant on the Hartman or Lloyd leases. Casing head pressures, that is pressures registered by a gauge at the head of the casing, were recorded. Appellant contends that through a study of casing head pressures and certain other factors it can be determined that the reservoir pressures must be lower on the
 
 *256
 
 Hartman lease than on the Lloyd, and hence drainage could not take place from the Hartman area to the Lloyd, since oil moves in the direction of lower pressure. Respondent has reached a contrary conclusion through its analysis of certain undisputed figures.
 

 The study of casing head pressures and certain other factors made by appellant and respondent in their briefs with a view to demonstrating the relative reservoir or bottom of the hole pressures as between the two leases was not developed by the expert witnesses for either side during the trial. As an appellate court, nonexpert in the' science of petroleum geology, a reading of the record does not supply us with the information sufficient to evaluate either the appellant’s or respondent’s deductions as to comparative reservoir pressures between the two leases. We cannot say that the study of pressures made in the briefs demonstrate whether the reservoir pressures are higher on the Hartman or on the Lloyd lease, or that said study either proves or disproves drainage from the Hartman tract to the Lloyd.
 

 Defendant’s witnesses assigned various reasons for their belief that drainage had not taken place. Defendant’s witness Folsom was of the opinion that the eleven Hartman south line wells would prevent passage of oil and gas from the north part of the Hartman lease into the Lloyd lease. The portion of the Lloyd lease which lies immediately south of the Hartman lease was drilled more lightly than the Hartman lease, and produced less oil and gas. This was because that portion of the Lloyd lease was close to the axis of the structure, and witnesses for both parties testified that it was good practice to drill the axis area lightly, thereby conserving the so-called “gas cap” at the crest in order to obtain a greater production through movement of this gas into the flanks. Since the eleven Hartman wells created areas of low pressure, this witness was of the view that the oil on the undrilled portion of the Hartman lease would not “by-pass” these points of low pressure into the lightly drilled Lloyd area at the crest and from there into the heavily drilled Lloyd area, which, it is claimed, drained the Hartman property. But plaintiff’s expert witness Grillan testified that the “tremendous pull” due to the large number of wells on the south flank ‘ ‘ dragged the oil right past the Hartman wells” and into the Lloyd tract.
 

 
 *257
 
 Defendant’s witness Uren and its witness Dodge testified, in support of their conclusion that there had been no drainage, that although there is a gradual growth in the area of influence of a well, eventually a point will be reached where the expulsive forces and certain retentive forces neutralize each other, and the growth of the area of drainage influence is then arrested.
 

 As to the fact of drainage, the record is in a state of conflict. We conclude that the defendant has not as a matter of law negatived the existence of drainage. The jury by its verdict for plaintiff on conflicting evidence concluded that there had been drainage.
 

 This brings us to the question of the sufficiency of the evidence to support a judgment in the amount fixed by the jury’s verdict. The loss, according to plaintiff’s witnesses Soper, Herold and Gillan was the difference between what the Hartman lease actually produced, and what it would have produced if it had been drilled equally with the 23 well Lloyd area. The Hartman lease produced 2,269,087 barrels of oil between March 1, 1929, and March 1, 1933. The south flank 23 well area of the Lloyd lease comparable in size and location produced 9,036,493 barrels. The difference is 6,767,406 barrels, and according to said witnesses this difference represented the loss to the Hartman property for the four year period. The one-eighth royalty due the parent lessor upon 6,767,406 barrels of oil and upon the lessor’s interest in the gas produced amounts to $1,247,220. Allowing for discrepancies and possibility of error in calculation, Soper fixed the damages suffered by plaintiff at a minimum of $1,200,000, a maximum of $1,300,000, while Herold gave as a rough estimate $1,120,000.
 

 The witness Gillan for plaintiff estimated damages by a slightly different method at between $1,100,000 and $1,217,-000, but His method also .involved the assumption that the Hartman lease if equally and simultaneously drilled with the 23 well area of the Lloyd lease would have produced what the Lloyd» area actually produced with drainage from the Hartman property.
 

 The 23 well Lloyd area produced 9,036,493 barrels in the four year period this production including oil claimed by plaintiff to have been drained from the Hartman property. It was the theory of plaintiff’s witnesses that if 23 wells had
 
 *258
 
 been drilled on the Hartman, both it and the 23 well Lloyd area would have produced 9,036,493 barrels. How can it be, defendant asks, that when the 23 well Lloyd area produced 9.036.493 barrels with the unequal drilling and with drainage from the Hartman property, that if 23 wells had been drilled on each tract and there had been no drainage, both tracts would have produced 9,036,493 barrels? Appellant’s counsel in the cross-examination of the plaintiff’s witness Soper suggested that to ascertain the production which each area would have had with coequal drilling the figure of 9.036.493 barrels actually produced on the Lloyd 23-well area should be added to the 2,269,087 barrels actually produced on the ITartman lease, and the total divided by two, giving 5,652,790 barrels as the hypothetical production of each area upon coequal drilling, with a loss of 3',383,703 barrels to the Hartman lease. (Difference between 5,562,790 and 2,269,087.) This is just one-half the loss as figured by plaintiff’s expert witnesses with use of the figure of 9,036,493 barrels as the production which the Hartman lease would have had with equal drilling. The verdict of the jury was for $593,700, slightly more than one-half of the lowest estimate of damages fixed by plaintiff's experts and less than one-half of the maximum estimate of said witnesses. This figure is well within the amount which would arise from a loss of 3,383,703 barrels, as suggested by appellant.
 

 The above discussion has been based on an acceptance of the proposition that the north flank Hartman lease and the south flank Lloyd lease are areas of approximately equal impregnation. Otherwise the foundation upon which rests the only evidence as to the amount of drainage is removed, for if the areas are not equally impregnated they could not have produced the same amounts had they been equally drilled. No witness even attempted to suggest any method for estimating drainage as between two areas of unequal natural productivity. A formula adapted to calculating drainage as between two coequal areas—that each area if equally drilled would have produced the same amount—is obviously not appropriate for determination of drainage problems as between two areas of unequal saturation.
 

 Plaintiff’s expert witnesses admittedly
 
 assumed
 
 equal impregnation and uniformity of other conditions affecting the productivity of oil. This assumption was based on the premise that the anticline was structurally symmetrical at the
 
 *259
 
 producing horizons below the Gosnell shale, that is, that each flank had the same angle of slope. This conclusion as to subsurface symmetry the plaintiff’s witnesses based on the subsurface contour map of the base of the Gosnell shale, Exhibit 215 herein. Said map was prepared in 1932 from data obtained from production records of defendant company by defendant’s employee Hertel. It has been published in technical journals as the subsurface contour map of the Ventura Avenue oil field.
 

 Since no witness for plaintiff gave it as his opinion that equality of impregnation could be assumed except in the case of a symmetrical anticline, defendant has sought to establish that notwithstanding the comparative symmetry shown by Exhibit 215 the anticline is nevertheless asymmetrical below the surface at the producing horizons. On this appeal defendant contends that the evidence introduced by it demonstrates as a matter of law that the anticline is asymmetrical. Defendant further contends that irrespective of structural symmetry or asymmetry, that is, angle of slope of the flanks, it has demonstrated as a matter of law that the two flanks are not equally impregnated, but are areas of unequal natural productivity. That is, notwithstanding the anticline is structurally symmetrical, the impregnation of the two flanks may be unequal. Plaintiff’s experts merely stated that
 
 in the absence of evidence to the contrary
 
 it must be assumed that impregnation of both flanks of the symmetrical anticline is equal. Defendant contends that it has introduced evidence to the contrary, which as a matter of law proves in this case that the impregnation and productivity is unequal.
 

 Thus defendant’s proof and its contentions in its briefs on this appeal are directed on this phase of the ease to two propositions: (1) That the anticline is not symmetrical. (2) That regardless of symmetry the 'north and south flanks are unequally saturated with oil, the south flank being much more productive than the north.
 

 We shall consider first the matter of symmetry. Plaintiff states in its briefs that its contention is one of relative symmetry. Exact symmetry does not exist in a state of nature. Computations of underground drainage necessarily must be estimates, and although there is some deviation from exact symmetry it is nevertheless proper to make an estimate of drainage based on symmetry. Plaintiff's conclusion that
 
 *260
 
 the anticline was symmetrical is based on the subsurface contour map, Exhibit 215, prepared by defendant’s employee Hertel, and used generally as the subsurface contour map of this field. Hertel, upon the trial, testified that the contour lines drawn on said map on the north flank north of the 3700-foot contour were drawn with few points of control, since there were few wells north of that contour, and that as wells were subsequently drilled on the north the contour lines were found to have been improperly placed. A substantial part of the Hartman lease lies north of the 3700-foot contour.
 

 Defendant’s witnesses also testified that an examination of well cores indicated a much steeper dip in the producing horizons on the north than on the south. Plaintiff’s witnesses were of the view that well cores furnished an inadequate basis for determining the dip of the structure, due to difficulty of obtaining “oriented” cores, that is, cores in which the direction, as well as angle of dip, was known. Defendant’s witnesses stated that the direction of the core samples presented no problem, but could be ascertained merely from knowledge of which side of the flank the core was taken from.
 

 ' Plaintiff’s witness Soper prepared cross-sections of the field from the subsurface contour map, Exhibit 215, designed to prove that at greater depths below the Gosnell shale from which production was being obtained the tendency of the structure was to become increasingly symmetrical. But defendant’s witness Folsom by a different method prepared subsurface cross-sections from measurements of dips taken at the surface, which, in the opinion of said witness, proved asymmetry at producing depths.
 

 It is apparent from recital of the above matters that the evidence as to symmetry is’sharply conflicting. It cannot be said as a matter of law that defendant’s evidence conclusively establishes asymmetry.
 

 This brings us to point 2: That regardless of symmetry the north and south flanks are unequally impregnated with oil. The defendant has sought to demonstrate the unequal impregnation and productivity of the two flanks through a consideration of uncontradicted drilling and production records of the Hartman and Lloyd leases, and certain other leases in the field. Defendant contends that the manner in which other
 
 *261
 
 operators in the field have located wells indicates unequal impregnation of the two flanks. Throughout the field the north flank has very few wells as compared with the number on the south flank, and the north flank wells are relatively light producers. In the event of equal impregnation of both flanks it seems unlikely that all lessees, while drilling the south flank heavily, would have failed to drill the north flank equally and thereby treat all north flank lessors unfairly. Defendant further contends: (1) that the gray sands found in a number of Hartman wells at depths found to contain oil bearing sands on the Lloyd lease negative equality of impregnation as between the north and south flanks; (2) that a comparison of the figures for the initial production, that is, the first day’s production, of the Hartman and Lloyd wells demonstrates unequal productivity; (3) that the records■ of north flank wells Magenheimer 1A and Petroleum Securities 1 demonstrate the unequal impregnation of the two flanks.
 

 Plaintiff’s experts through their study of the field were aware of the facts upon which defendant relies as establishing inequality of impregnation between the two flanks as a matter of law. If said facts did not lead these experts to conclude that the field was asymmetrical and unequally impregnated to such an extent that estimates of drainage based on equal productivity were invalid, wc are of the view that as an appellate court we cannot conclude that substantial inequality of impregnation is established without invading the province of the jury and trial court.
 

 In addition to the above facts appearing from drilling records, defendant relies to establish inequality of impregnation on certain laboratory tests which it procured to be made to determine relative porosity as between the two flanks. According to defendant, these tests demonstrate that the porosity of the south flank exceeds that of the north. A more porous sand has more space within which to contain oil and generally will be more productive than a more compact sand. The testimony of plaintiff’s experts was that the tests made from a few samples by defendant’s witnesses were not a reliable index of the comparative porosity of the north and south flank areas as a whole. This testimony conflicts with the opinion of defendant’s experts that the samples were truly representative and provided a reliable, scientific index of comparative porosity as between the two flanks.
 
 *262
 
 The jury resolved this conflict in favor of plaintiff. The judgment for damages must be affirmed.
 

 Plaintiff not only prayed for money damages for the four year period preceding action filed, but also for forfeiture of the lease by reason of defendant’s failure to protect against drainage. As to this equitable side of the case, the court submitted an advisory special interrogatory to the jury as to whether there had been drainage. The jury returned an affirmative answer. The court thereupon made findings and rendered a decree to the effect that it is the didy of defendant to proceed diligently to protect plaintiff’s land from drainage; that if defendant fails to protect plaintiff’s land from drainage it shall forfeit the lease; that if defendant determines that it is no longer profitable to continue drilling operations on said Hartman lease it shall have the option to abandon said lease or any part thereof; that in the event of either voluntary abandonment or forfeiture the defendant should be entitled to retain all wells theretofore drilled, together with a protective area around each well. The decree further provided that the court reserved all right and jurisdiction at any time thereafter, upon reasonable notice to determine the sufficiency of compliance by defendant Associated Oil Company with the terms and conditions of the judgment.
 

 We are of the view that the conditional decree for forfeiture cannot be sustained for the reason that the owners and holders of the parent lease have not been made parties to this action. Defendant, as we held earlier in this opinion, is a sublessee. Acts which constitute grounds for forfeiture of a parent lease may be committed through a sublessee as well as by the owner and holder of the parent lease. But in an action wherein it is to be determined that the sublessee has committed acts which forfeit the parent lease, the sublessors, who are the owners and holders of such lease, should be parties.
 

 A person is an indispensable party when the judgment to to be rendered necessarily must affect his rights. (See. 389, Code Civ. Proc.;
 
 Ambassador Petroleum Co.
 
 v.
 
 Superior Court,
 
 208 Cal. 667, 673 [284 Pac. 445];
 
 Waterman
 
 v.
 
 Canal-Louisiana Bank Co.,
 
 215 U. S. 33, 49 [30 Sup. Ct. 10, 54 L. Ed. 80];
 
 Shields
 
 v.
 
 Barrow,
 
 17 How. 130, 139 [15 L. Ed. 158].) In the instant case the» court and jury have determined upon conflicting evidence that drainage exists, and the court has rendered a conditional decree for forfeiture.
 
 *263
 
 Upon forfeiture of the parent lease, the sublease, which depends thereon, will fall. If the adjudication of cause for forfeiture, and any decree of forfeiture which may be entered pursuant thereto are binding upon the owners and holders of the parent lease, that is, the sublessors, then said sub-lessors are deprived of the parent lease and of the sublease in an action to which they are not parties, and in which the evidence that gave cause for forfeiture is conflicting. Such an adjudication necessarily affects their valuable rights.
 

 It cannot be said that the adjudication for a forfeiture will be binding only as between parent lessor and sublessee, and that the rights of the lessees-sublessors may be saved. Under the decree of forfeiture it would be the duty of the sublessee to surrender possession to the parent lessor. Such a surrender would result in the sublessors losing their tenant, the sublessee, and in termination of the parent lease under which they have rights as lessees.
 

 We have found no decision in this or in other states which involves the exact situation of the instant case, but there are a number of decisions from other jurisdictions which indicate the proper rule in the instant case. We may cite
 
 American Trust & Sav. Bank of Albuquerque
 
 v.
 
 Scobee,
 
 29 N. M. 436 [224 Pac. 788]
 
 ; Pyle
 
 v.
 
 Henderson,
 
 55 W. Va. 122 [46 S. E. 791];
 
 Vincent Oil Co.
 
 v.
 
 Gulf Refining Co.,
 
 195 Fed. 434;
 
 Moore
 
 v.
 
 Jennings,
 
 47 W. Va. 181 [34 S. E. 793];
 
 Steelsmifh
 
 v.
 
 Fisher Oil Co.,
 
 47 W. Va. 391 [35 S. E. 15];
 
 South Penn Oil Co.
 
 v.
 
 Miller,
 
 175 Fed. 729;
 
 McConnell
 
 v.
 
 Dennis,
 
 153 Fed. 547;
 
 United Fuel Gas Co.
 
 v.
 
 Morley Oil & Gas Co.,
 
 101 W. Va. 73 [131 S. E. 713].
 

 In
 
 McConnell
 
 v.
 
 Dennis, supra,
 
 the Circuit Court of Appeals had before it a case in which the owner of land, Amanda Miller, executed a deed to McCready. Thereafter Amanda Miller executed an oil lease to Dennis and others, plaintiffs in the action. McCready, the prior grantee of Miller, also executed an oil lease. Her lessee, McConnell, was named as defendant in an action brought by Dennis and others, lessees of Miller, to restrain McConnell from asserting any rights under his lease from McCready. It was held that McCready was an indispensable party to the action. The court said: “The bill was solely for injunctive relief to restrain McConnell, the lessee, from drilling, boring, or conducting mining operations on the premises for the production of oil or gas. The
 
 *264
 
 decree . . . permanently enjoined McConnell from asserting any right, title, claim, or interest thereon, or from in any manner interfering with complainants in the exercise of the exclusive rights so confirmed in them. Nothing could more effectually extinguish Abba Clair McCready’s rights secured by the lease than such a decree. Obedience to its command by McConnell necessarily put a stop to her royalties in kind and in money and the enjoyment of the other privileges secured to her by her lease and contract with McConnell.
 

 “No objection appears to have béen made below to the court’s proceeding to a decree in the absence of Abba Clair McCready; but that is unimportant. The case is now here on appeal for a hearing
 
 de novo,
 
 and we cannot avoid considering the question whether the parties are sufficient to warrant a decree granting any relief. ’ ’
 

 The decision in
 
 Ambassador Petroleum Co.
 
 v.
 
 Superior Court,
 
 208 Cal. 667 [284 Pac. 445], does not govern the instant ease as to this matter. That case involved a proceeding by the state to enjoin defendants, who' were forty-two operators in the Santa Fe Springs oil field, from unreasonable waste of natural gas. The action was brought under the authority of a statute enacted for the protection of the natural resources of petroleum and gas from waste and destruction through improper operations in production. (Stats. 1915, p. 1404, as amended Stats. 1929, p. 923.)
 

 The parties defendant in said proceeding made application for a writ of prohibition to this court to restrain further proceedings until the owners and lessors of the land should be joined as defendants. Said owners received royalty upon oil produced by the operators. Our opinion indicates that the lessor-owners would be bound by any curtailment decree rendered against the lessees in the action to abate a statutory nuisance. But said opinion expressly recognized that a different rule would be applied in private disputes, such as that before us. The opinion says: “Many eases are cited by the petitioners wherein the court hás found that certain absent parties were indispensable and hag refused to proceed without their presence, or where the court has threatened to proceed in their absence and been prohibited from so doing until they are brought in. These eases need not be discussed in detail. Generally it may be said that they involve disputes between private owners or lessees or rival claimants of oil or gas
 
 *265
 
 wells or property or involve conflicting claims of the parties in their private capacity. When the action is one to enjoin the continuance of or to abate a nuisance, a different rule has been applied.”
 

 The objection that an indispensable party has been omitted may be raised at any time by the trial or appellate court of its own motion if the parties fail to make the objection. The requirement that indispensable parties be before the court is mandatory.
 
 (Title Guarantee & Trust Co.
 
 v.
 
 Henry,
 
 208 Cal. 185, 191 [280 Pac. 959];
 
 Ambassador Pet. Co.
 
 v.
 
 Superior Court, supra; O'Connor
 
 v.
 
 Irvine,
 
 74 Cal. 435 [16 Pac. 236];
 
 Solomon
 
 v.
 
 Redona,
 
 52 Cal. App. 300 [198 Pac. 643].) In paragraph VIII of its demurrer defendant urged only that there was a defect of parties for the reason that the defendant Associated Oil Company had subleased only a portion of the demised premises from the original lessees, and none of said original lessees were made parties. This specification had reference to the fact that the sublease had originally excluded the area surrounding the two wells retained by the Shell Oil Company. But this land was later added to the sublease before bringing of this action upon its surrender by the Shell Oil Company. Under the above decisions, however, the failure of the defendant to place its objection to the nonjoinder of the lessees on broader grounds did not bar it from raising the objection of nonjoinder of indispensable parties on appeal.
 

 Our conclusion that the lessees-sublessors are indispensable parties to an action to forfeit the parent lease does not mean that they are indispensable parties to an action to recover damages for drainage against the sublessee based on its promise assuming the obligations of the parent lease. The sub-lessors have no beneficial interest in the damages based on the one-eighth percentage recovered by the parent lessor against the sublessee.
 

 The judgment for damages is affirmed. The portion of the judgment relating to forfeiture is reversed.
 

 Rehearing denied.