[Civ. No. 6272.   Second Appellate District, Division Two.—September 26, 1930.]

GARLAND P. FALLIS et al., Appellants, v. JULIAN PETROLEUM COMPANY (a Corporation), Respondent.

Harold C. Morton and Fredericks, Hanna & Morton for Appellants.

McAdoo, Neblett, O'Connor & Clagett, William H. Neblett, Anderson & Anderson, Anderson & Anderson & Sheahan and A. G. Ritter for Respondent.

CRAIG, J.—By a contract dated February 26, 1925, the appellants leased to the defendant Courtney Petroleum Company for a period of five years certain real property upon which the latter agreed to drill to a depth of 5,200 feet for oil, gas and other allied products, and to pay as rental $2,500 from the first production and one-sixth of all other production. The lessee drilled to a depth of 4,158 feet, whereupon by written assignment and a collateral contract, it delivered possession to respondent Julian Petroleum Corporation. The lessors do not appear to have consented to the assignment. On December 20, 1926, the lessors commenced this action against their original lessee and its assignee by a complaint consisting of three causes of action, embracing said lease and contemporaneous agreements, alleging that the Julian Corporation had not drilled to a depth exceeding 4,162 feet, that both companies had ceased operations and that through their negligent and unworkmanlike conduct of the project production had failed. The original lease provided that "the terms and conditions hereof shall be binding upon, and accrue to the benefit of the heirs, executors, successors and assigns of the respective parties hereto, and an acceptance of an assignment hereof, by any person, shall be construed as a promise on his part to be bound by and perform all of the lessee's

covenants herein contained. Time is of the essence of this lease.'' By the assignment it was agreed that the Courtney Company sold and conveyed to the Julian Corporation ''all of the right, title and interest of the original lessee and present owner in and to said lease and all rights thereunder''. The collateral agreement recited that said assignment was made upon conditions and covenants not contained therein, but which were contained in the collateral contract; that if the well be put on production at a depth less than 4,600 feet, but should make less than 350 barrels, it should be deepened to a specified horizon located approximately 5,000 feet to 5,100 feet; that the assignee ''does not undertake to complete said well as a producing oil well at said depth, but does agree to properly drill the same to said depth and there endeavor in the usual and customary manner to place the same on production''. By the terms of the original lease it was recited that it was impossible to determine from current developments as to the necessary depth of the well, but that at a later date the parties would confer regarding the progress of other wells in that vicinity, and ''determine what is the best to do for their mutual interests'', and the lessors reserved the right to determine the lease for failure to perform any of its terms or conditions upon ten days' notice of election so to do. Neither of these two provisions appears to have been observed by the parties. The plaintiffs alleged that ''had a well been drilled on said leased property as so required by said lease to a depth of fifty-two hundred (5200) feet, or production at a lesser depth, a well producing oil and gas in large and commercial quantities would have re- ·sulted'', that one-sixth of the production would have been worth $65,000; that the Julian Corporation failed to continue drilling to a depth of 5,200 feet, or to a lesser depth at which mineral in paying quantities might be found, and that it had not been paid the $2,500 nor placed the well on production by diligent or continuous operation in good faith.

The respondent Julian Corporation interposed a demurrer to the complaint, upon general grounds, and specifically urging that it failed to allege any obligation of said corporation to drill to a depth of 5,200 feet, what, if any, would have been the initial production, how long the well

would have produced, or at what rate, or the price of oil over any period of production, or upon what basis the plaintiffs computed the amount of $67,500 for which they prayed judgment. The demurrer was sustained without leave to amend as to the Julian Corporation, and the plaintiffs appealed.

The first point advanced by appellants is well taken. While the respondent by accepting an assignment of the lease became liable only to the lessee, its entry into possession created the relation of landlord and tenant between the original lessor and the assignee, and its holding created a privity of estate. (*Bonetti* v. *Treat*, 91 Cal. 223 [14 L. R. A. 151, 27 Pac. 612]; *Webb* v. *Jones*, 88 Cal. App. 20 [263 Pac. 538].)

It is observed that the sublessee did not agree with the lessee to drill below 5,100 feet, nor to complete a producing well, and that the original parties did not confer regarding surrounding developments as to means or methods contributing to their mutual benefit However, regardless of these omissions, without some knowledge as to the necessary depth, the probable regularity or volume of flow, if any, or the market price of such production, the amount of damages or rentals is wholly unascertainable. While, as argued by appellants, a demurrer admits the pleaded facts, the allegations and constituent contracts concede that respondent's sole neglect or evasion consisted of a failure to drill to a depth of 5,200 feet, that it agreed to pay no rental except from production, and that it did not contract to furnish a producing well. Respondent agreed to drill but 5,100 feet, and its experienced drillers may have determined at a depth of 4,162 feet that further expenditures for that purpose would be futile. Damages for the breach of covenants, such as are here presented, may be agreed upon in advance, and an amount so fixed will be presumed as adequate compensation for losses incurred by a lessor through failure of performance by the lessee. (Civ. Code, secs. 1670, 1671.) When profits are wholly prospective and speculative or conjectural, and the success or failure of such an experiment is of mutual interest, neither party is the arbiter of the extent to which or the diligence with which operations shall proceed. (*Brewster* v. *Lanyon Zinc Co.*, 140 Fed. 801 [72 C. C. A. 213].) Hence, if the

compensation or penalty be not specified by the parties, or if it be impracticable or extremely difficult of estimation, they are relegated to proper proceedings in equity for relief. (*Hanlon Dry Dock etc. Co.* v. *McNear,* 70 Cal. App. 204 [232 Pac. 1002]; *Brewster* v. *Lanyon Zinc Co., supra; Craig* v. *Wade,* 159 Cal. 172 [112 Pac. 891].) ''No damages can be recovered for breach of a contract which are not clearly ascertainable in both their nature and origin.'' (Civ. Code, sec. 3301.)

In the instant case even the initial payment of $2,500 is dependent only upon a mere venture, and is wholly contingent upon uncertainties, the extent of which cannot be estimated or determined judicially in dollars and cents. It is a matter of common knowledge that the success or failure of such enterprises, and the casualties and incidental effort and expense of production, if any result, are matters ever held in suspense until mineral is found or the project is abandoned. By the most favorable reading of the complaint and the contract of the parties, this fact appears to have been recognized. It was expressly stated that ''the lessee agrees as a further consideration to pay the lessor one-fourth ($\frac{1}{4}$) of the entire production from the lease, of all oils or other hydro-carbons''; ''Said twenty-five hundred dollars ($2500) oil bonus to be paid out of twenty-five per cent. (25%) of the gross production of oil, gas and other hydro-carbons''; ''a one-sixth royalty and the twenty-five hundred dollars ($2500) provided for in said lease to be paid out of twenty-five per cent. (25%) of the first oil''.

The principles above announced were aptly applied in the case last cited (*Craig* v. *Wade, supra*), wherein the plaintiff sought to recover upon alleged misrepresentations as to the value of certain oil properties. Our Supreme Court there said:

''Twenty thousand dollars may have been expended in sinking a well which has not yet reached oil sands, and which may never reach them. To a sanguine man in the expectation of soon striking oil, the well may have a value of many hundred of thousands of dollars. To the pessimistic man, who believes oil will never be struck, the twenty thousand dollars expended is money lost, and the well is valueless. So, too, if oil be in fact found, the duration of its flow is entirely uncertain and the flow itself may in-

crease or decrease without apparent reason. If the well yields one hundred barrels of oil today, it may yield a thousand barrels, or none at all, tomorrow. To place a value in terms of money upon such a flowing well must, therefore, itself, of necessity be a matter of opinion merely, since it is not within human knowledge to foresee the contingencies which may result in greatly enhancing or utterly destroying its output."

There are other decisions in this state of like import. (*Escondido Oil Co.* v. *Glaser*, 144 Cal. 494 [77 Pac. 1040]; *Burrows* v. *Petroleum Dev. Co.*, 181 Cal. 253 [184 Pac. 5]; *Sledge* v. *Stolz*, 41 Cal. App. 209 [182 Pac. 340].)

Numerous decisions from other jurisdictions expressly detail evidence of proximate locality of adjacent wells, and the quantity of their production, as a basis for calculating damages, from which it may be inferred that the pleadings were so framed as to permit of its introduction. Likewise, in *Julian Petroleum Corp.* v. *Courtney Petroleum Co.*, 22 Fed. (2d) 360, 362, wherein the same lease here in controversy was involved, it is recited that witnesses testified "that they were familiar with the Athens field, and the location and the production of other wells in that field; that the well in question was favorably located; that, if drilled to the Miley sand, the well would, in their opinion, have produced oil; that the estimated cost of drilling the well to the Miley sand would be a certain amount; that the production of oil would be a certain quantity; that the cost of operation would be a certain amount; and that the oil would sell for a certain price". However, we are of opinion that it was error to sustain the demurrer without leave to amend. The plaintiffs should be permitted to proceed further in the premises as they may be advised.

Authorities upon which the appellants rely in support of their theory of recovery are not persuasive, since they either sound in tort or arise from facts furnishing fixed bases for the estimation of damages, such as the known production of other wells in the immediate locality, as was the case in *Wheeland* v. *Fredonia Gas Co.*, 92 Kan. 50 [139 Pac. 1010]. We think the rules applicable to the instant case are so well established that to confuse them with distinctions would serve no good purpose.

The judgment is reversed.

THOMPSON (IRA F.), J., Concurring.—I concur in the judgment but deem it proper to set forth my views therefor.

The third cause of action in particular alleges that the leased premises were in proven oil territory; that the drilling of a well to the required depth of 5,200 feet in a workmanlike and careful manner and with due diligence would have resulted in the production of oil and gas in large quantities; that by reason of the negligent failure to drill to the depth mentioned the property was drained of its oil and its gas pressure reduced by wells on adjacent and surrounding property; that by reason thereof plaintiffs have been damaged in the sum of $67,500. There is also an allegation that the defendants well knew that "highly prolific oil and gas producing sands underlay said property" at the time of the execution of the lease and prior to the assignment to the defendant. The last averment is tantamount to an allegation that the parties had in contemplation the possibility of the property being drained of its mineral substance by the surrounding wells, or at least it is readily amendable to state that ultimate fact. I do not find the California authorities relied upon by respondents to be in point. Concededly they establish the rule of law that in similar instances liquidated damages are permissible on account of the extreme difficulty of fixing damages arising from the breach of such a contract. The language of *Parkinson* v. *Langdon*, 36 Cal. App. 80 [171 Pac. 710], indicates, however, that the difficulty of measuring the damages does not of necessity mean that he who is wronged by the breach of a solemn obligation shall be remediless. It is there said: "The line of distinction between profits which are remote, consequential, or not within the contemplation of the parties, and those which are proximate and absolute and certain, and within the contemplation of the parties, 'seems to rest in the question whether they are to arise directly out of the contract in question or its subject matter, and to constitute the immediate fruits of the contract, or whether they are to result from collateral engagements or enterprises. Where the profit to be made was the inducement to the contract, such profit is the measure of damages. So a recovery may be had for the loss of profits which are the direct and immediate fruits of the contract

itself. Such profits are not to be regarded as consequential, remote, or speculative in character, but are regarded as part and parcel of the contract itself, entering into and constituting a portion of its very elements, something stipulated for, and the right to the enjoyment of which is just as clear and plain as to the fulfillment of any other stipulation'. (Id.) The foregoing is about as satisfactory an explanation of the philosophy of the rule as we can find in the books and, it seems to us, furnishes a safe guide to a solution of the question here. The contract plainly shows that the land was to be planted to a specific crop and none other. Both parties understood this and contracted with reference to that understanding. Plaintiff's compensation was to be measured by an agreed *percentum* of this specific crop and not otherwise. Given land suitable for growing beans; condition of soil, climate, moisture, etc., favorable to the production of a profitable crop, and nothing supervening to prevent such result except the failure of the contracting party to do what his contract required of him, it seems to us, we have a clear case where the loss to the lessor 'is such as might naturally be expected to follow from the breach', and that he would be entitled to the 'profits which would ordinarily and naturally, and in the usual course of things have been derived from performance', and furnishes an instance where 'the loss flows directly and naturally from the breach of the contract itself', and is recoverable, since the loss is 'naturally incident to the contract and may be fairly supposed to have been within the contemplation of the parties when it was made'.'' To the same general effect reference may be had to *Sanford* v. *East Riverside Irr. Dist.*, 101 Cal. 275 [35 Pac. 865], and *Meer* v. *Cerati*, 53 Cal. App. 497 [200 Pac. 501].

I am convinced that the court should have permitted the plaintiffs to make proof, if such they could, of the allegation that they had been damaged by the draining of their property by surrounding wells. A few quotations from persuasive authorities in other jurisdictions will indicate the reasons I entertain for such opinion. In *Blair* v. *Creek Oil & Gas Co.*, 148 Ark. 301 [19 A. L. R. 430, 230 S. W. 286], we find two pertinent expressions of the court as follows:

''The record shows that drilling wells is very expensive and is only undertaken where the lessee has a large area

of acreage in a block. It is a matter of common knowledge that the landowner is not equipped with machinery for drilling and could not purchase such machinery on short notice, if able to do so. Hence when he leases his land to another with the exclusive right to drill for oil and gas on it for a stipulated period of time, there is an implied covenant on the part of the lessee to protect the land at least from wells drilled by him on adjoining property which will necessarily draw the gas from the lessor's land. If there had been no lease on his land, the lessor could have had all the time during which the wells were drilled on adjoining land to have arranged for the drilling of an offset well on his land and in case a producing well was brought in on the adjoining land which would draw the gas off his own land. Of course, if he failed to make such an arrangement, the loss would fall upon himself. In case, however, he has leased his land to another and has given the lessee the exclusive right to drill on his land for gas, it is obvious that the mere right of forfeiture in case the lessee would not drill a protection well would not afford him adequate relief. . . .

"It appears from the record that expert witnesses acquainted with the gas field may testify with reasonable accuracy as to the number of wells which should have been drilled on the leased land for protection from drainage. Such witnesses might also testify with reasonable accuracy as to the quantity of gas obtained from the wells. They did say that the sand in which the gas was found was sufficiently porous that a well would draw from underneath the ground gas for a distance of a quarter of a mile in all directions. The record in the case also shows that the three wells operated by appellee on the adjacent tract will in due course of time draw all the gas from underneath the land of appellants. The lessee under the facts disclosed by the record is liable to the lessors for their proportionate share of the gas taken by the wells drilled so near their boundary lines as to draw off the gas underneath their land. There is no reason why it cannot be ascertained with reasonable certainty what quantity and quality of gas has been and will be taken from appellants' land through the wells drilled and operated by appellee on the adjoining land. *Culbertson* v. *Iola Portland Cement Co.,* 87 Kan. 529 [125

Pac. 81, Ann. Cas. 1914A, 610]." And on rehearing it was also said:

"From the evidence already taken it would seem that the gas-producing on the leased premises and the land adjacent thereto is of uniform character, and that expert witnesses can with a reasonable amount of certainty tell the amount of gas that will be drawn from the leased premises by the wells dug near the boundary line by the lessee on the adjacent premises. When the amount of gas that will be drawn from the leased premises is ascertained, the amount of damages to be recovered can be readily fixed by the royalty that the lessor was to receive."

In *Daughetee* v. *Ohio Oil Co.*, 263 Ill. 518 [105 N. E. 308, 310], in which case the plaintiff sought to recover damages for the breach of a covenant requiring the lessee to drill additional wells after the the first one had proved the territory, the opinion reads in part as follows:

"Plaintiff in error contends that, even if a right of action exists, no recovery can be had because the damages are uncertain, remote and speculative. This point is preserved by an exception to the refusal of the trial court to hold as law a proposition embodying plaintiff in error's view upon this point. It is undoubtedly the law that, where speculation or conjecture must be resorted to for the purpose of determining whether the injury results from the wrongful act charged or from some other cause, then the law denies the injured party his action for damages. This is only another way of stating the familiar rule that damages must be the proximate result of the injury complained of. This rule was announced by this court in *Indianapolis, B. & W. Ry. Co.* v. *Birney*, 71 Ill. 391, which is relied on by plaintiff in error in support of this contention. The right of recovery being assumed, plaintiff in error cannot escape liability because the damages are difficult of exact ascertainment. The nature of the inquiry here is such that it is practically impossible to ascertain with mathematical certainty the exact amount of defendant in error's damages. This, however, affords no answer to a cause of action resulting from the breach of contract or a duty imposed by law. The unliquidated damages growing either out of breach of contract or the commission of a tort are seldom susceptible of exact measurement. If such exactness were

required, the law of damages would be of little practical value. The rule is that while the law will not permit witnesses to speculate or conjecture as to possible or probable damages, still the best evidence of which the subject will admit is receivable, and this is often nothing better than the opinion of well-informed persons upon the subject under investigation. Chamberlayne on Evidence, sec. 2332. Plaintiff in error does not contend that the court allowed improper and irrelevant evidence to be introduced in regard to the damages.''

In *Culbertson* v. *Iola Portland Cement Co.*, 87 Kan. 529 [Ann. Cas. 1914A, 610, 125 Pac. 81], we read: ''Since the number of wells to be drilled on the land was not specified, there was an implied obligation on appellants to fully develop the land and put down as many wells as were necessary to secure to appellee his proportionate share of the pool of gas. *Kleppner* v. *Lemon*, 176 Pa. 502 [35 Atl. 109]; Thornton on Oil and Gas, sec. 91. According to the findings, appellants failed to develop the land in such a way as to give appellee his proportionate share of the gas produced from the pool, and that to have done so would have required the sinking of at least another well. Having failed in this respect, the appellee is entitled to recover his share of the gas actually taken from his land, without regard to which side of the line the wells through which it was taken were sunk. The quantity so taken appears to have been fairly well established by the evidence. In *Howerton* v. *Kansas Natural Gas Co.*, 82 Kan. 367, 369 [34 L. R. A. (N. S.) 46, 108 Pac. 813, 814], it was said that: 'No reason is seen why witnesses of experience, acquainted with the gas field, may not testify with reasonable accuracy as to the number of wells which should have been drilled on the leased land, both for protection from drainage by neighboring leaseholds, and to obtain the gas underneath the land'.'' And lastly, I quote from *Wheeland et al.* v. *Fredonia Gas Co.*, 92 Kan. 50 [139 Pac. 1010], as follows:

''This action was brought for failure to develop the land, a trial was had, and evidence was produced. Under these conditions it was impossible for the appellees, there being no further development of the land, to prove the actual amount of damages they had suffered. The nature of the case is such that it is impossible to tell what a well will

develop until it is sunk, and yet experts in oil territory are able to furnish reasonably accurate estimates of what a certain territory will produce, estimating from producing wells in the locality. This the appellants did in this case. The appellee demurred to their evidence, and the court sustained the demurrer. There was evidence tending to show that the one well was not sufficient development to protect the land from the gas being drawn from it by wells on adjacent lands.

"The plaintiff in this action followed the procedure indicated by these decisions and offered the only evidence possible to establish a claim for damages, to-wit, the opinions of experts. To say that the evidence in this case did not furnish a reasonable basis for estimating damages is to override the reasoning of all these cases. All the business of leasing lands for development is based upon the opinions of men engaged in the business as to the value of the tracts leased for that purpose, and it is competent evidence; although it is impossible thereby in a particular case to show the exact amount of damage which has been suffered, it is sufficient to enable a jury to estimate the damages and to find accordingly."

Likewise the case of *Julian Petroleum Corp.* v. *Courtney Petroleum Co.*, 22 Fed. (2d) 360, supports the view I entertain.

Works, P. J., concurred.