[Civ. No. 1944. Fifth Dist. Jan. 20, 1975.]

T. E. FISHER et al., Plaintiffs and Appellants, v.
L. M. HAMPTON, Defendant and Respondent.

COUNSEL

Roland S. Woodruff for Plaintiffs and Appellants.

Arthur E. Wallace for Defendant and Respondent.

OPINION

BROWN (G. A.), P. J.—Plaintiffs and appellants, T. E. Fisher and Floyd Hall, sued defendant and respondent, L. M. Hampton, for damages for alleged breach of a limited partnership agreement and appeal from a judgment by the court, sitting without a jury, denying relief.

After several preliminary meetings, the plaintiffs as limited partners and defendant as sole general partner executed a certificate of limited partnership on June 18, 1970. The agreement, which was drawn by defendant's attorney, states in part that: "2. The character of the business intended to be transacted by said limited partnership is the acquisition of an Oil and Gas Lease from George N. Bastian et ux covering the W½NW¼ and the NW¼SW¼ Section 10, T22S, R27E, MDB&M, in Tulare County, California, and to drill and complete a well thereon sufficiently deep to penetrate and test the producing zones encountered in the wells heretofore drilled and completed on said land (and now

suspended or abandoned) as a steam stimulated well, and if successful to further drill, develop and produce such property."[1]

The agreement also provided: "5. The term of said limited partnership shall commence upon the execution hereof and shall continue thereafter during the continuance of operations by said limited partnership on the Oil and Gas Lease referred to in paragraph 2 above, . . ."

The sole contribution of the plaintiffs as limited partners was the procuring and assignment of the oil and gas lease, and the evidence is without conflict that they completely performed as agreed.

The contribution of the general partner was described as: "(b) The contribution of the general partner shall consist of such sums of money as may be required to drill and complete the one well provided to be drilled, completed and equipped on said George N. Bastian et ux lease, and to operate and produce said well as a steam stimulated well for so long as the well may produce oil in paying quantities, i.e. in quantities sufficient to yield a reasonable profit of repayment of all drilling, completing, equipping, testing, producing and operating costs, and/or to abandon such well if the same shall not produce oil in paying quantities, provided that the general partner shall not be required to expend in excess of $35,000," and the defendant, as general partner, had "the sole and exclusive management and control of the partnership business . . ." with all of the rights and powers of a general partner under California Corporations Code section 15509.

The net income from the working interest production as defined in the agreement was allocated 50 percent to the general partner and 25 percent each to the limited partners.

Jack Decker, a geologist and engineer who had prepared a report on the Bastian property for plaintiffs in 1968, was introduced to defendant on July 23, 1970, for the purpose of acquainting defendant with the petroleum geology of the property. The report Decker had prepared indicated there might be approximately 1,000,000 barrels of oil recoverable under the entire Bastian parcel.

---

[1]The evidence shows that the agreement as originally drawn referred to an oil lease on a parcel of Tenneco property and that sometime later the parties substituted the Bastian lease. The Bastian lease was actually executed on August 6, 1970, and assigned to the limited partnership on August 7, 1970.

Between July 23, 1970, and August 14, 1970, defendant undertook his own investigation of the feasibility of drilling for and the prospects for obtaining oil production on the lease. His investigation included a physical examination of the premises with two persons, a Mr. Sudmeier and a Mr. Barnes. The former was of the opinion that oil probably could not be found beneath the premises in paying quantities, and Mr. Barnes thought that the lease was "absolutely uneconomical."

On August 14, 1970, defendant was furnished with Jack Decker's map of the property, cost estimates for drilling the well and bids for the drilling of the initial well on the property.

On August 17, 1970, defendant decided not to drill the well because it was "economically inadvisable," and advised the plaintiffs through Mr. Decker that "the deal was off."

In deciding the cause for the defendant, the trial court found the agreement was valid and was not induced by fraud but "[t]hat at the time the Limited Partnership Agreement was entered into between the parties . . . the defendant had not been furnished nor had he acquired sufficient geological information covering the lease in question to make a valid business decision whether or not to drill the well contemplated by the Limited Partnership Agreement," and that "thereafter, on or about August 17, 1970, the defendant, L. M. HAMPTON, based on the information furnished to him and acquired by his independent efforts, made a decision, in good faith, that it would not be in the best business interest of the partnership to drill the initial well contemplated by the Limited Partnership Agreement and there was, in his best business judgment, insufficient likelihood of success to warrant the expenditure of the funds necessary to drill and complete the initial well." The court also found: "That plaintiffs have suffered no damage whatsoever as the result of defendant's failure and refusal to expend the sums of money required to drill and complete one (1) well on the subject property."

■ It is evident from the court's notice of intended decision and comments made during the argument on objections to findings that the court's basic rationale was that the defendant, as general partner, had the authority to decide as a matter of business judgment not to expend up to $35,000 to drill a well.

We cannot agree with this aspect of the trial court's holding, but nevertheless affirm the judgment because plaintiffs have failed to prove their right to recover under any legally cognizable theory of damages.

The agreement expressly requires the drilling of at least one well and the expenditure of up to $35,000 for that purpose. The trial court made no finding, nor did it suggest or hold that the agreement was unclear, uncertain or ambiguous, nor was there conflicting evidence offered regarding the meaning of the language of the contract. Under these circumstances, to hold the general partner has the right to violate the explicit requirement to drill at least one well and pay up to $35,000 toward the cost thereof is not only a violation of the plain terms of Corporations Code section 15509 but permits the general partner to defeat his express obligation under the agreement, thus rendering his promise wholly illusory. Section 15509 provides in part:

"(1) A general partner shall have all the rights and powers and be subject to all the restrictions and liabilities of a partner in a partnership without limited partners, except that without the written consent or ratification of the specific act by all the limited partners, a general partner or all of the general partners have no authority to

"(a) Do any act in contravention of the certificate,

"(b) Do any act which would make it impossible to carry on the ordinary business of the partnership, . . ."

The act of refusing to drill the well and pay the cost thereof clearly was in contravention of the certificate and rendered it impossible to carry out the business and purpose of the partnership (see *Donroy, Ltd.* v. *United States* (N.D.Cal. 1961) 196 F.Supp. 54, 58-59), thereby causing a dissolution of the partnership (Corp. Code, § 15031, subd. (2))[2] and giving rise to a cause of action for damages for breach of contract in the plaintiffs (Corp. Code, § 15038, subd. (2)(a) II).[3]

---

[2]Corporations Code section 15031 provides in part:
"Dissolution is caused:
"
"(2) In contravention of the agreement between the partners, where the circumstances do not permit a dissolution under any other provision of this section, by the express will of any partner at any time; . . ."

[3]Corporations Code section 15038 provides in part:
"(2) When dissolution is caused in contravention of the partnership agreement the rights of the partners shall be as follows:
"(a) Each partner who has not caused dissolution wrongfully shall have,
"
"II. The right, as against each partner who has caused the dissolution wrongfully, to damages for breach of the agreement."

## DAMAGES

The legal measure of damages for breach of contract is defined in Civil Code section 3300: "For the breach of an obligation arising from contract, the measure of damages . . . is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."

An injured party may recover for the profits or benefits which he would have obtained by performance if he can establish them with *reasonable* certainty. (Civ. Code, § 3301; 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 645, p. 549.)

■ Where the lessor of oil or mineral producing property sues for damages when the lessee breaches a contract to drill or mine, California follows the appropriate contract measure of damages in permitting the lessor to prove the amount of royalties he lost by reason of lessee's breach.[4] (*Gold Min. & Water Co.* v. *Swinerton* (1943) 23 Cal.2d 19, 32, 38-42 [142 P.2d 22]; *Fallis* v. *Julian Petroleum Co.* (1930) 108 Cal.App. 559, 562-564 [292 P. 168]; *Julian Petroleum Corporation* v. *Courtney Petroleum Co.* (9th Cir. 1927) 22 F.2d 360, 362-363.)

*Gold Min. & Water Co.* v. *Swinerton, supra,* 23 Cal.2d 19, involved a mining lease requiring the lessee to remove 300,000 cubic yards of gold ore, the lessors to be paid a royalty percentage on the gross value of the ore removed. The lessee repudiated the lease, and the trial court permitted the lessor to recover the potential loss of royalties. The court said:

"The majority rule relating to oil and gas leases appears to be that where a lessee fails to perform his lease and the lessor suffers damages as a result of the loss of royalty on the oil or gas which the lessee would have extracted from the leased premises had the lease been performed, the lessor may recover the full amount of the royalty to which he would have been entitled had the lessee fully performed. [Citations.]" (23 Cal.2d at p. 39.)

---

[4]There are, of course, additional elements of uncertainty introduced into the problem of making proof when one seeks loss of profits rather than lost royalties as in the cases cited in the text. A royalty is a percentage of the gross oil or minerals sold, whereas in computing a net profit, as in the case at bench, it is necessary to take into account all the operating and production costs of the well. That circumstance, however, creates a problem of proof but does not alter the proper legal measure of damages as being the loss of net profits.

"In other words, what plaintiff is entitled to recover from defendants under the rule here announced *is damages for the failure of defendants to perform their agreement under the lease to mine the property, extract the mineral therefrom and pay plaintiff a royalty thereon.* Since defendants have failed to perform, plaintiff may recover from them as damages an amount equal the amount of royalty which plaintiff would have received had defendants operated the property in accordance with the provisions of the lease." (23 Cal.2d at pp. 41-42.)

While the principles surrounding the "loss of royalties" theory of damages may be used here by analogy, appellants seek recovery of lost profits suffered as a result of the breach of a partnership contract. We perceive no reason why the recovery of the net profits from the sale of the potential production from an oil well to be drilled is not subject to the accepted principle that damages must be established with reasonable certainty. ■ Those enunciated principles are that the loss of anticipated profits from a new business is too speculative and conjectural to permit recovery of damages for their alleged loss. (*Alder* v. *Drudis* (1947) 30 Cal.2d 372, 382 [182 P.2d 195]; *Macmorris Sales Corp.* v. *Kozak* (1968) 263 Cal.App.2d 430, 442-444 [69 Cal.Rptr. 719]; 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 647, p. 551.) However, the rule is not a hard and fast one, and loss of prospective profits may nevertheless be recovered if the evidence shows with reasonable certainty *both* their *occurrence* and the *extent* thereof. (*Gerwin* v. *Southeastern Cal. Assn. of Seventh Day Adventists* (1971) 14 Cal.App.3d 209, 221 [92 Cal.Rptr. 111]; *Cleaning & P. Co.* v. *Hollywood L. Service* (1932) 217 Cal. 124, 134 [17 P.2d 709]; *Mahoney* v. *Founders' Ins. Co.* (1961) 190 Cal.App.2d 430, 436 [12 Cal.Rptr. 114].) Uncertainty as to the *fact* of whether any damages were sustained at all is fatal to recovery, but uncertainty as to the *amount* is not. (*Aronowicz* v. *Nalley's, Inc.* (1972) 30 Cal.App.3d 27, 39-40 fn. 11 [106 Cal.Rptr. 424]; *Gilman* v. *Nemetz* (1962) 203 Cal.App.2d 81, 91 [21 Cal.Rptr. 317, 94 A.L.R.2d 1332]; *Noble* v. *Tweedy* (1949) 90 Cal.App.2d 738, 745-746 [203 P.2d 778]; *Monroe* v. *Owens* (1946) 76 Cal.App.2d 23, 30 [172 P.2d 110].)

■ A synopsis of the evidence of loss of profits presented at the trial demonstrates the inadequacy of proof both as to the fact and as to the amount of damages; thus, the trial court's factual finding that no damage was suffered as a result of the failure to drill and complete the well is supported by substantial evidence.

Jack Decker, consulting geologist, had prepared a report on the Bastian property. Prior to 1970, there had been 18 wells which were

drilled and abandoned on or near this property because commercial production could not be obtained. He testified. that the Bastian area was not an oil and gas producing area from 1968 to the time of trial.

Mr. Decker estimated that approximately 1,000,000 barrels of oil were possibly recoverable under the entire 40-acre parcel. He said the oil is there but there would be a problem in producing it because of a lack of active water or gas drive in the oil. The estimated cost to drill an initial well on the property, using steam to restore energy and reduce viscosity, would be $34,000. He further testified that only by drilling one well could it be established if oil can be produced in commercially profitable amounts.

Mr. Decker stated: "There's no guarantee that any well will produce, no matter where you drill;" "All oil drilling is a speculative venture, a high risk venture."

Richard Ganong, consulting petroleum engineer and geologist, also estimated that approximately 1,000,000 barrels of oil could be recovered at a profit from the Bastian property. He testified that the Bastian property was a commercially recoverable field because the viscous oil is highly responsive to thermal procedures, i.e., steam stimulated drilling.

Ganong testified that an entire development program of 14 wells must be considered in order to derive profit from the property. His opinion was that the total cost to develop the 14 wells would be $342,000, at a total profit of $586,000. "[A] single well by itself is a highly risky venture . . . ." Ganong testified further that there is a degree of speculation as to how much oil could be recovered and said the Internal Revenue Service classifies the oil business as a high risk business.

Lyle Garner testified for respondent. Based on 37 years of experience with drilling and operating oil wells and the actual drilling of three wells on the Bastian property, Garner concluded that the thin sands on the property would prevent production in commercial quantities. His opinion was that using steam to stimulate production would not produce a profit from wells on the property.

Thus there was no testimony that any oil could be recovered at a profit from the drilling of *one well,* and there was no testimony as to the extent of possible profits from the *one initial well.*

Both Decker and Garner proposed well programs which would encompass more than one well (Decker: 4 wells costing $100,000; Ganong: 14 wells costing $342,000). Both agreed that a single well venture was speculative and risky. Since appellants sought damages based on the profits lost from the failure to drill one well, it was incumbent upon them to establish those damages with reasonable certainty. It is obvious that the court's finding that plaintiffs failed in this respect is supported by substantial evidence and cannot be disturbed on appeal.

■ Appellants contend that they are entitled at least to the amount it would have cost to drill and complete one well, the uncontested evidence having shown that amount to be $34,000. This rule of damages is referred to as the "cost of drilling" rule.[5]

The leading case expounding this rule of damages is *Fite* v. *Miller* (1940) 196 La. 876 [200 So. 285]. In that case the court explained: "The plaintiff lost the right to have the well drilled by the defendant through his breach of the contract. The value of this right or the act of performance is the amount of money that it would have cost the defendant to drill the well when he should have done so. Therefore, it is our conclusion that the amount that it would have cost to drill the well at the time of performance furnishes a measure for determining the value of the loss or damage which the plaintiff sustained as a result of the defendant's unjustifiable nonperformance or breach of the contract, which deprived the plaintiff of his right to have the well drilled by the defendant." (196 La. at p. 886 [200 So. at p. 288].)

---

[5]Respondent urges that plaintiffs are precluded from arguing this theory of damages on appeal because of an alleged failure to raise the issue in the trial court. (See *Ernst* v. *Searle* (1933) 218 Cal. 233, 240 [22 P.2d 715]; *Lundquist* v. *Marine Engineers Beneficial Assn.* (1962) 208 Cal.App.2d 390, 396 [25 Cal.Rptr. 250].) However, after a review of the allegations of the complaint and its prayer, and the record of the trial court, including the admission of evidence of the cost of drilling the initial well without objection and the comments of counsel during the argument on respondent's motion for a nonsuit, we have concluded that this theory was an issue in the case. For example, in a demand letter from plaintiffs to defendant attached to and incorporated in the complaint, plaintiffs' counsel stated:

"My clients have performed all obligations on their part to be performed and unless you promptly perform your obligations my clients will suffer substantial damages, the exact amount of which has not yet been determined, but which will amount, at least, to a reimbursement of their time and expenses together *with the cost of drilling the initial well.*" (Italics added.)

Further, during the argument on defendant's motion for judgment of nonsuit, defendant's counsel stated: ". . . and yet these gentlemen are requiring or asking the court to require in essence that Mr. Hampton put up that kind of money for the purposes of drilling a single well, which was indicated to be the cost of such a well."

The rule has been applied in Colorado (*Landauer* v. *Huey* (1960) 143 Colo. 76 [352 P.2d 302]), Kansas (*Gartner* v. *Missimer* (1955) 178 Kan. 566 [290 P.2d 827]), Montana (*Brown* v. *Homestake Exploration Corporation* (1934) 98 Mont. 305 [39 P.2d 168]), and Oklahoma (*Ardizonne* v. *Archer* (1919) 72 Okla. 70 [178 P. 263]). The rule has not been adopted in California. (See *Higgins* v. *Grant* (1931) 111 Cal.App. 351 [295 P. 532]), and it has been expressly rejected in Texas (*Guardian Trust Co.* v. *Brothers* (Tex.Civ.App. 1933) 59 S.W.2d 343, error refused; *Fain-McGaha Oil Corporation* v. *Owens* (1938) 132 Tex. 109 [121 S.W.2d 982]) and in Canada (*Albrecht* v. *Imperial Oil Ltd.* (Alberta 1957) 21 W.W.R. 560, 7 O. & G.R. 739).

In explicating its reasons for rejecting the "cost of drilling" rule, the Texas court in the *Guardian Trust Co.* v. *Brothers* case made some sound and informative observations:

"Suppose these appellants had been the owners of a vacant lot in the town of Desdemona, near which the land covered by this lease is situated, and had entered into a contract with appellee, under the terms of which appellee agreed to erect a building thereon according to certain specifications and to pay appellants one-eighth of the gross revenues to be derived from renting the building, and that the contract had provided that appellee should have the right to remove the building at the expiration of the lease, placing the land in as good condition as it was before the lease was given. Then suppose that appellee had failed to erect the building. Would it be seriously contended that appellant's measure of damages for the breach of that contract would be what it would have cost to erect the building? We think not. The loss or injury actually sustained by the obligee, rather than the cost of performance by the obligor, is the proper measure of damages for the breach of a contract. When that well-established rule is departed from, compensatory damages become either punitive damages, because too much, or inadequate damages, because too little, and the fundamental purpose of compensatory damages is lost sight of.

"We can see no just reason for departing from the well-established rule of law for measuring damages simply because the contract relates to the sinking of an oil well. The fact that the nature of the contract is such as to render it impossible to ascertain with mathematical accuracy the exact amount of the damages suffered by the lessor should not operate to change the rule. The parties knew that difficulty inhered in the subject about which they were contracting, but chose not to stipulate for liquidated damages." (59 S.W.2d at pp. 345-346.)

The traditional goal in awarding damages for breach of contract is to award a sum that will put the nonbreaching party in as good a position as he would have been in had the contract been performed, i.e., compensation. (Dobbs, Remedies (1973) § 12.1, p. 786; 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 637, pp. 541-542.) This is said to give him his expectancy and to protect his "expectation interest." In this case, "expectancy damages" would consist of the provable profits, if any, which would have been obtained from the drilling of the one initial well.

Specific performance is performance of the very thing called for by the contract; by this theory, a plaintiff may avoid the difficulties of estimating and proving damages. (Dobbs, Remedies (1973) § 12.2, pp. 795-796.) Awarding damages based on the "cost of performance" (i.e., cost of drilling), instead of on the basis of the loss or injury actually sustained by the promisee (loss of profits), is analogous to compelling specific performance of the contract in the form of requiring the payment of the money it would cost to drill the well, rather than by requiring the well to be drilled. Accordingly, the cost of drilling rule is inconsistent with the proper legal measure of damages for breach of contract in that it measures the damages to the promisee by the cost of performance to the promisor, rather than by the value of performance to the promisee; such a measure bears little or no relationship to the loss suffered by the promisee. We do not believe that such a rule can be justified solely because of its simplicity in application and efficiency in securing performance and because the application of the correct rule creates difficulties in proof, when the rule in legal theory violates fundamental precepts of contract damages. (Civ. Code, §§ 3300, 3301, and cases cited *supra*.) For the foregoing reasons we decline to follow the "cost of drilling" rule of damages under the facts of this case.

The judgment is affirmed.

Gargano, J., and Franson, J., concurred.